# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                   Case No. 10-30430-WRS
                                              Chapter 7

KEITH A. NELMS,

         Debtor

CHASE BANK USA, NA
and JP MORGAN CHASE
BANK NA,

         Plaintiff                                  Adv. Pro. No. 10-3042-WRS

    v.

KEITH A. NELMS,

         Defendant

## MEMORANDUM

       This case came before the Court for trial on April 28, 2014. The Plaintiff, Chase Bank,

seeks a determination that the debt is excepted from the bankruptcy discharge of Keith Nelms

pursuant to 11 U.S.C. § 523. For the reasons set forth below, judgment is entered in favor of the

Plaintiff.

## I. FINDINGS OF FACT

### A. History of this Adversary Proceeding

       On February 22, 2010, Keith Anderson Nelms filed a voluntary Chapter 7 petition with

this Court, initiating Case No. 10-30430. At the time of his filing, Nelms was the sole owner and

operator of Allegro Law, LLC, and Allegro Financial Services, LLC, operating out of Prattville,

Alabama. Through his Allegro entities, Nelms purported to offer legal and financial services

targeted at consumers in search of debt relief, through debt settlement and debt management schemes. Chase Bank filed a proof of claim for $39 million. (Case No. 10-30430, Claim 2-1).

On June 1, 2010, Chase bank initiated this adversary proceeding by way of a complaint alleging nondischargeability of debt owed to it by Nelms pursuant to 11 § U.S.C. 523. Chase Bank alleged four claims for relief, seeking that their debt be excepted to discharge under § 523(a)(2)(A) for fraud, § 523(a)(4) for fraud in a fiduciary capacity, § 523(a)(4) for embezzlement, and § 523(a)(6) for willful and malicious injury. Chase pled facts alleging that Nelms, through Allegro Law, LLC, operated a fraudulent debt settlement scheme under which he discouraged consumers from paying monthly minimums to Chase on the promise that he would negotiate a reduction in the debt or settle the debt in full. In exchange, Chase alleged, Nelms collected millions of dollars in fees, and made no attempts to actually settle or pay the consumers' debts. As a result, Chase customers "faced increased interest rates, late fees, further damage to their credit ratings, and additional and increased collection activities by their creditors." (Adversary Proc. No. 10-3042, Doc 1). Chase alleged that, as a result of Nelms's fraudulent scheme, "Chase cardmembers responsible for more than 5000 accounts have ceased making payments on at least $39 million in credit card balances owed to Chase." Id. The case came before the Court for trial on April 28, 2014.

### B. Hess-Kennedy as Pre-Cursor

In 2007, a Florida law firm known as Hess-Kennedy began running a debt settlement scheme in the state of Florida. Operating under several names, Hess-Kennedy undertook the business of promising consumers legitimate debt relief. Debt settlement, in a nutshell, is premised on the idea that a consumer in debt signs on with a company which promises to

2

negotiate with the creditor to settle the debt for less than the balance owed. The Hess-Kennedy scheme, like most debt settlement outfits, operated under the basic premise that consumers in debt would, instead of making monthly payments to their creditors, make monthly lump sum payments to Hess-Kennedy. Hess-Kennedy, in exchange, would attempt to make debt settlement arrangements with the creditors, and then, out of the money sent to them by the consumer, commence payments to the creditor at the newly reduced amount. For their troubles, Hess-Kennedy would collect its fees from the consumers' lump sum payment.

In order to make this scheme work, Hess-Kennedy encouraged the consumers not to pay their debts, but to instead dispute the billings under the Fair Credit Billing Act, 15 U.S.C. §§ 1666 et seq., and Hess-Kennedy would send legal form letters advising the creditor that they were performing a financial evaluation of the consumer's account. These form letters bore the letterhead of either Hess-Kennedy or one of their related entities, such as Campos Chartered Law Firm or Consumer Protection Law Center. The letters were often signed by Jeffrey Campos, an attorney affiliated with Hess-Kennedy. The accounting, clerical work, mailings and the like were handled by a back-office processor, Americorp, Inc., which was headed by Timothy McCallan. Chase proved at trial that between 2007 and April 2008, they received approximately 8,000 such letters from Hess-Kennedy related outfits.

In mid-2008, Hess-Kennedy ran afoul of the Florida Attorney General's Office, who brought legal action alleging an "unscrupulous scheme to divert funds" from consumers and to instead "divert[] millions of dollars to themselves and a coterie of family and associates who were not creditors of consumers." See Office of the Attorney General v. Laura Hess, Esquire, et al., No. 08-007686-08, at p. 15-16 (Cir. Ct. Broward County, Fla. Jul. 17, 2008). On July 18,

3

2008, the circuit court of Broward County, Florida appointed a receiver to take over Hess-Kennedy, and Hess-Kennedy was permanently enjoined from operating its scheme on November 25, 2008. This ended Hess-Kennedy's debt settlement activities. Representatives of Americorp approached Nelms in 2008, with the proposition that he take over the function previously handled by Hess-Kennedy. Thus, the Allegro entities were born.

### C. Allegro Law, LLC

#### 1. Nelms Continues the Hess-Kennedy Operation

Prior to opening Allegro Law, Nelms was familiar with and involved in the workings of Hess-Kennedy. At trial, Nelms detailed his initial introduction to debt settlement programs and Hess-Kennedy, recalling working with one of Hess-Kennedy's principals, Edward Cherry (also known at one time as Edward Kennedy), several years prior to Allegro taking over in 2008. Nelms was approached by Cherry to build an attorney network for Hess-Kennedy, and testified that he was paid approximately $15,000 for the service, a service that he says he was hired to do several times. Nelms's involvement with Hess-Kennedy became so entwined that upon Hess-Kennedy's assignment into the Florida receivership, the receiver running Hess-Kennedy hired Nelms to represent the entity.

Through his involvement with Hess-Kennedy, Nelms testified to being introduced to Americorp and its CEO Timothy McCallan. While publishing a series of websites that Nelms described as for consumer attorneys, Nelms became acquainted with another debt management operator, Joel Carlsen, who later introduced Nelms to McCallan. While McCallan and Americorp were initially too busy with Hess-Kennedy to work with Nelms's Allegro outfit, that dynamic changed when the Florida Attorney General put Hess-Kennedy out of business. Nelms testified at

4

trial that he did some internet research on McCallan, learning of McCallan's previous operations of AmeriDebt and DebtWorks, both debt relief scams, and but that "nothing scared me too much."[1]

On April 30, 2007, Allegro Law was incorporated as a law firm. Nelms was the sole owner and operator of Allegro Law, and at trial he testified that he was the sole attorney working for Allegro and that he approved every settlement that came through the enterprise. Nelms testified that Allegro Law had at least 15,000 clients, though he thought the number perhaps exceeded 19,000, with each client having an average of five creditors.

In beginning the operation of Allegro Law, Nelms testified that he employed the same personnel and debt settlement tactics as Hess-Kennedy. Nelms admitted to using the identical Hess-Kennedy marketers, back-office processors, phone call center, and the same form letters. The marketers used by Hess-Kennedy simply switched to marketing for Allegro, with one marketer stating that upon switching to Allegro, "the flow kept going. Like nothing changed." Tr. 101:10-21. Nelms hired McCallan and Americorp to handle the back-office processing for Allegro. This included processing of the form letters, manning the call centers, and all the accounting for thousands of customer payments, essentially handling the servicing of all client accounts.[2] Nelms paid a set-up fee and monthly fee per client of Allegro to Americorp, fees

---

[1]Nelms testified that at the time he was unaware of the Federal Trade Commission's disgorgement of $1.9 million from McCallan as part of the fallout from McCallan's AmeriDebt scheme. Tr. Transcript 136:5-137:13.

[2]Q: You only had a few employees between you and your Cobbs Ford Road. I mean, all the accounting for those thousands of payments wasn't done by the people in your Cobbs Ford Road office, was it? I mean, it was done by Americorp.

Nelms: No. I paid Americorp to do it. Tr. Transcript 165:13-17.

5

derived out of the Allegro customers' monthly payments. The very strategies and tactics employed by Hess-Kennedy to purport to settle debts were used by Nelms and Allegro. Nelms directed the customers to stop paying Chase, to instead pay him the money as their attorney, and then collected substantial amounts of money in fees from those consumer payments.

One of the more telling pieces of evidence shown at trial to prove Nelms's continuation of the Hess-Kennedy debt settlement scheme were the form letters sent to Chase throughout 2007 and 2008. The letters essentially track the progression of the scheme originally operated as Hess-Kennedy under Campos to one operated as Allegro Law under Nelms. The letters sent beginning in late 2007 through early 2008 are headed under a variety of Hess-Kennedy related outfits: Hess-Kennedy Chartered, December 31, 2007; Campos Chartered Law Firm, January 7, 2008; Consumer Protection Law Center, February 26, 2008. Each of these letters are signed by Jeffrey Campos and contain identical language:

> The firm represents the above listed named consumer in regards to the referenced account. The above consumer is in the process of receiving a financial evaluation and is enrolled in a bankruptcy prevention service.
>
> During the next 60-90 days, our counselors will be reviewing the consumers[3] personal financial statements, including the above referenced account. In addition, we will be archiving and preparing a summary of all collection activities of any original creditor, third party collection agent or collection attorney.
>
> We ask that your representatives not contact our client but instead direct any and all correspondence to our firm. Contacting a consumer, which is known to be

---

Nelms further testified that "[b]etween May and maybe early December [2008] they were - those monies being taken directly by Americorp from the consumer" and put into approximately 15 to 16 bank accounts. Tr. Transcript 162:1-163:17

[3]The referenced form letters are typed and uniform in appearance in all respects, including that on each letter, both those sent from Hess-Kennedy and those from Allegro, the word "consumer" is typed with a handwritten "s" inserted at the end of the word.

represented by a law firm, can be classified as a deceptive trade practice. Your failure to abide by this request will result in our pursuing all legal and equitable remedies available under state and federal law.

Please direct any and all future correspondence to our attention, including the address and facsimile number of the division to which you would prefer all correspondence and information directed.

Tr. Ex. 3.

Beginning in April 2008, following Hess-Kennedy's initial legal troubles with the state of Florida, Chase Bank began receiving more form letters disputing debts and purporting to settle the debts; letters identical to those received from Hess-Kennedy, only now under the letterhead of Allegro Law. While these letters were initially signed still by Jeffrey Campos, they soon began, in May 2008, appearing with the signature of Keith Anderson Nelms. During Allegro's period of operation, roughly May 2008 thorough May 2009, Chase tracked 5,453 such letters as having come from Allegro. As a collections manager for Chase testified, "as Hess-Kennedy was ramping down, Allegro started ramping up." Tr. Transcript 34:12-18.

### 2. Nelms, through Allegro Law, makes fraudulent representations to Chase Customers

The Court heard testimony from three former Allegro customers who had credit accounts with Chase. Each testified as to their involvement with Allegro, the tactics used to ensnare them in the debt scheme, and the destructive results the Allegro experience had on each of their lives. The experiences were largely similar, and each Allegro customer the Court heard from exited the program in remarkably worse financial, and often even personal, shape than when they entered into business with Nelms and Allegro. The Court found that their testimonies were credible and compelling, and offered a telling insight into the scheme Nelms ran under the name Allegro Law.

7

Darlene Richardson, a hospital employee from Philadelphia, Pennsylvania, testified to becoming involved with Allegro Law after hearing a radio advertisement purporting to be lawyers that could fix her credit. Richardson called Allegro, and was told that she would pay in a fixed monthly amount to Allegro, who would then go to each creditor to obtain settlements for her at lower rates. At the time, Richardson owed $26,000 in debt, approximately $5,000 of that owed to Chase Bank, and entered her entire debt load into the Allegro program. Richardson made payments of $457 monthly, and stayed with Allegro from March 2008 through June 2009, where she was instructed Richardson to stop paying her creditors. During her enrollment with Allegro, Richardson testified to noticing no difference with her creditors, who were still calling in attempts to collect the debts.

Overall, during her fifteen-month involvement with Allegro, Richardson paid in approximately $6,000. Allegro settled one debt for her for around $500. Richardson testified that in November 2008, she received a letter from Chase Bank offering to settle the debt directly with her, outside of the Allegro program. She recalled that the offer from Chase was to settle the debt one of two ways, either through an immediate payment of $503.72, or through two payments of $453.35. Believing Allegro was working on her behalf to achieve these settlements, she forwarded the letter to Allegro, wanting the account to be settled with money she had paid into the program. At this point, having paid $457 per month since March 2008 would have meant Richardson had paid roughly $3,000 into her Allegro account. Upon receipt of the settlement offer from Chase, Allegro informed Richardson that there was not enough money in her escrow account, informing her, "that money, of course, has to be – go to them first to be paid before any

8

creditors could be paid off." Darlene Richardson Dep. Transcript 19:7-10. Richardson was unable to settle the debt with Chase.

Israel Rubinfeld, a small business owner from New Jersey, also entered the Allegro Law program in 2008, after hearing a radio advertisement promising to settle debts. At the time, Rubinfeld had nearly $33,000 in debt, owing around $2,500 to Chase Bank. Rubinfeld explained his dealings with Allegro:

> Okay. So I called them up and I said, you know, I'm looking to settle my debt, what can you do. And they said, how much do you owe. So I said, I – you know, I quickly accumulated in my mind how many credit cards, how much I owed, and I gave them a rough figure. I can't remember, but it could be in the range of 30 - 33,000. So they made a quick calculation and told me, okay we could do it for $600 a month for 37 months and you'll be done. We'll clear your, you know, debt
> ***
> They said they will settle for a certain amount. Basically they accumulate money to a escrow account, and then they take that money after a certain amount of time, let's say they accumulate $5,000, and this is just a rough number, they go then and settle one card. Then after a while, after a few more months, they accumulated more money, they settle the next card. And so forth and so forth until they settled all the cards.

Israel Rubinfeld Dep. Transcript 11:5-24 - 12:1-5. Rubinfeld stated that he continued to pay Allegro through the end of 2009, and that he did not pay his creditors, upon the advice of Allegro. Throughout his involved with Allegro, Rubinfeld paid them $6,442. Only $660.90 was accrued in his escrow account, and none of Rubinfeld's debts were settled.

The court also heard testimony from Melinda Lawley, a retired schoolteacher from Chelsea, Alabama. Ms. Lawley testified to becoming aware of Allegro Law in 2008 through a television advertisement, promising to negotiate with creditors for lower debt loads. Lawley then had a series of conversations with Allegro representatives in which these promises were repeated, that her debts could negotiated down to half, and that by paying through Allegro the rest could be

9

paid. Upon belief that Allegro was a law firm with attorneys qualified to do this, she entered her entire debt load, nearly $20,000, into the Allegro program, including close to $10,000 with a Chase credit card account. After entering the program, Lawley began to realize that she had been fooled. Her credit score began to drop and creditor calls continued because her bills were not being paid. The pressure from creditors became so intense that one threatened to sue. Upon being informed of this potential lawsuit, Lawley called Allegro, who she believed to be attorneys acting on her half, and was informed "that they were not attorneys and they could not stop it if they proceeded further . . . ." Tr. Transcript 83:9-25.

Ultimately, from April 2008 through May 2009, Lawley paid $5,170 into Allegro Law. Tr. Ex. 9. Allegro's records show that only $80.70 was on hand in her escrow account to be used for settlements. Put another way, after a year of paying into Allegro Law in hopes to pay off debt, only $80.70 did not go towards Nelms and Allegro in the form of fees. None of Lawley's debts were settled, and no money was paid to her creditors. Before entering the Allegro program, Lawley testified she and her husband had a credit score close to 700. After her involvement with Allegro, it fell to around 500.

Allegro Law charged their customers a fee comprised of 16% percent of the client's total debt load. The fee was designed to be front-loaded; that is, as monthly payments arrived, the money was first applied to pay the 16% fee before any money was placed into the client's escrow account to pay off debts. In addition, Allegro charged a $25 initial fee, and an administrative fee each month. For example, Ms. Lawley's account showed a recurring monthly charge of $59.99 marked as "Monthly Set Up Fees." Tr. Ex. 9. Of this administrative monthly fee, Nelms collected $6.00 per customer. He also collected a portion of the 16% front-loaded fee. Each customer

testified to being unaware of the extent of the fee structure, and that the front-loaded nature of the fee was never explained to them by Allegro representatives. Ms. Lawley testified:

> they never once told me that we're not paying this until all of your money is in and we're not paying a penny on your debt. So I started calling around to my debtors to find out what is being paid. There was nothing being paid. So I called back again to find out why are you not paying my bills like you promised and they started explaining, well, we have to get all of your money first.

Tr. Transcript 78:15-25. Nelms reported an income of $50,000 in 2007, which skyrocketed to $200,000 in 2008, the year he did business as Allegro.

After consideration of the accounts told by these customers, a pattern of misrepresentations is clear: Nelms, through Allegro, consistently misrepresented that Allegro Law would settle consumer debts. Nelms induced participation in the programs through misrepresentations that Allegro was a law firm. Further, Nelms misrepresented Allegro's fee structure.

### 3. Chase Bank Refuses to Settle With Allegro Customers

Allegro's very promise to settle any consumer debts with Chase was itself a misrepresentation as Chase had a standing policy of not negotiating settlements with Allegro Law. Over the life of Allegro Law, Nelms and Allegro purported to represent at least 5,453 Chase account holders, at least 20 percent of Allegro's overall business. Chase had a policy of not negotiating with Hess-Kennedy, and continued the policy with the appearance of Allegro Law. Nelms himself was aware of Chase's policy as early as August 2008, yet he continued, through Allegro, to collect money from Chase account holders in exchange for promises to settle their Chase debt. Nelms testified that he first learned that Chase would not settle accounts with Allegro in August 2008 , when Chase rejected an attempt to settle debt for 1,300 Chase

customers when it was apparent the customers had hired Allegro. Nelms testified that he then received a cease and desist letter from Chase in September 2008,which he understood to mean, "Chase was not going to deal with Allegro directly." Tr. Transcript 142:5-143:1. Nelms then testified about attending a meeting with Chase lawyers in New York in November 2008, where he admitted he was told Chase would not negotiate settlements with Allegro Law. Nelms also testified to receiving a follow-up letter to the same effect in February 2009, in which Chase again told him they would not negotiate with Allegro. Nelms testified, "The language of the letter is very clear." Tr. Transcript 146:7.

Despite the repeated communications from Chase, Allegro continued to represent to consumers that they could settle Chase debts. Each of the Allegro customers that the Court heard testimony from were Chase cardholders to whom Allegro had represented the ability to settle Chase debts. None of them were informed that Allegro could not settle with Chase, and Allegro continued to collect monthly fees and payments from them under the guise of attempting to settle the debts. Ms. Richardson was promised her $5,000 debt to Chase could be settled through Allegro. Richardson was an Allegro customer for 15 months beginning in March 2008, and was never informed by Allegro of the Chase policy, otherwise, she testified, she would not have enrolled in the program. The same was true for Mr. Rubinfeld, who owed $2,500 to Chase, and was never informed during his 16 months in the program of the Chase policy. Again, Ms. Lawley, who owed $10,000 to Chase, was promised this debt would be settled and in her year with Allegro was never informed that it could not be done. When asked why he continued to promise existing Chase customers that he could settle their debts, Nelms stated, "I didn't have a reason to tell customers I couldn't settle debts with Chase." Tr. Transcript 146:12-18.

12

Nelms's continued representation of Chase customers, despite awareness of the Chase policy, led to alarming delinquency rates among Allegro-affected Chase account holders. Melanie Cerminara, Chase's operations manager in collections at the time of Allegro's activity, testified that, based on Chase's records, seventy-four percent of the Chase customers associated with Allegro were either current or in early stages of delinquency.[4] Cerminara stated that in 2008, of all Chase accounts, approximately four to four-and-a-half percent of delinquent accounts would go into charge-off status; that is, debts that had been delinquent long enough that Chase wrote them off the books as non-collectable. For Chase customers dealing through Allegro, the charge-off status was "[v]irtually 100 percent." Tr. Transcript 37:12-17. Further, Cerminara testified that as of May 21, 2009, only 58 of the Allegro-affected Chase accounts had been settled. Even more alarming, of the 58 accounts settled, Chase's records show that 30 of the accounts were settled directly by the consumer themselves. Of the remaining 28, it is unclear if Allegro had any involvement. Allegro promised to represent at least 5,453 Chase customers in settling debt, and only 28 accounts had potential involvement from Allegro. Giving Allegro the benefit of the doubt, of the cases in which they were involved, they settled less than half of one percent of them.

---

[4]Cerminara explained that Chase defined the early stages of delinquency as up to 90 days past due; 90-120 days as somewhat early; and 150 or more days as late stage delinquency. For purposes of Allegro, she stated that Chase calculated early stages of delinquency as being "up to 120 days past due because of the lag time in receiving correspondence from Allegro." Tr. Transcript 42:10-25, 43:1-7.

**4. Allegro Law Prosecuted by the State of Alabama; Nelms Disciplined by the Alabama State Bar**

In 2009, Nelms ran into trouble with the State of Alabama. The Alabama Attorney General's Office began its prosecution of Nelms and Allegro after receiving several consumer complaints in March and May of 2009 of customers who had been ensnared by the debt settlement scheme.  The Alabama State Bar also became involved in the matter, and on June 25, 2009, entered an Order On Conditional Guilty Plea, under which Nelms pled guilty for violating numerous ethics rules. In the Plea, Nelms admitted to holding himself and Allegro out as legal service providers in debt management and debt settlement, and also admitted to collecting fees prior to the performance of services and without those fees being earned. The Alabama Bar suspended Nelms from practicing law for three years, and he was ordered to cease and desist from providing any legal services through Allegro Law. On June 30, 2009, the State of Alabama filed a complaint against Nelms in Autauga County Circuit Court seeking a temporary restraining order, which was granted on July 9, 2009. On the same date, the state court appointed Louis Colley as receiver to oversee Allegro. On February 11, 2010, the state court issued a permanent injunction and permanently appointed Colley as receiver. Allegro Law filed a Chapter 7 petition for bankruptcy on March, 12, 2010. (Case No. 10-30631).

## II. CONCLUSIONS OF LAW

Chase seeks to have the debt owed to it by Nelms excepted from his bankruptcy discharge. Chase alleges that Nelms incurred the debt through fraud, making it nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Chase also alleges that Nelms committed the fraud and embezzlement while in a fiduciary capacity, making the debt nondischargeable pursuant to 11

14

U.S.C. § 523(a)(4). Finally, Chase also seeks an exception to discharge under 11 U.S.C. § 523(a)(6) for willful and malicious injury by Nelms. The Court finds that Chase has proven its case under § 523(a)(2)(A), showing that Nelms perpetrated a massive fraud on thousands of Chase cardholders and diverted millions of dollars due to Chase. While there is a failure to show a sufficient fiduciary relationship under § 523(a)(4), and the Court finds a discussion of § 523(a)(6) unnecessary, the § 523(a)(2)(A) fraud claim provides ample basis for an exception to Nelms's discharge

### A. Actions Challenging Dischargeability

Section 523 provides for exceptions to certain debts from a debtor's discharge. At issue in this case is a debt that Chase alleges should be nondischargeable due to false pretense, false representation, and fraud. The court strictly construes exceptions to discharge in favor of the debtor, St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 680 (11th Cir. 1993), and the plaintiff seeking the exception to discharge bears the burden of proof, Fed. R. Bankr. P. 4005; see also Grogan v. Garner, 498 U.S. 279, 285, 11 S.Ct. 654, 658 (1991) (holding that preponderance of the evidence is the proper burden of proof in nondischargeability proceedings); and In re Bullock, 317 B.R. 885, 889 (Bankr. M.D. Ala. 2004).

### B. The Fraud Committed by Nelms's Agents is Imputed to Nelms

When a creditor can prove the debtor's agent committed fraud, the nondischargeability of the debt incurred through that fraud may be imputed to the debtor. Strang v. Bradner, 114 U.S. 555, 561, 5 S.Ct. 1038 (1885). After Strang, the majority of courts have followed the Supreme Court's holding to mean that an innocent debtor's liability for an agent's wrongdoing is nondischargeable under § 523(a)(2)(A). Indeed under this Circuit's precedent it is recognized

that, "[a] debt may be excepted from discharge when the debtor personally commits actual, positive fraud, and also when such actual fraud is imputed to the debtor under agency principles." Hoffend v. Villa (In re Villa), 261 F.3d 1148, 1151 (11th Cir. 2001) (though choosing not to extend the imputation of fraud to § 20(a) of the Securities Exchange Act) (citing Strang). The bankruptcy courts of this district have followed suit, recognizing the imputation of an agent's fraud to the principal for nondischargeability purposes in a commercial or business context. See In re Gordon, 293 B.R. 817, 822 (Bankr. M.D. Ga. 2003) (collecting cases).

Proving fraud liability for a principal through the actions of one's agent for purposes of § 523 nondischargeability has taken the form of two tests. The majority of courts have taken the approach that "an innocent debtor's liability for her agent's wrongdoing is nondischargeable under § 523(a)(2) regardless of the debtor's knowledge or participation." In re Heinz, 501 B.R. 746, 761 (Bankr. N.D. Ala. 2013) (citing Carroll v. Quinlivan (In re Quinlivan), 434 F.3d 314 (5th Cir. 2005)). This test presents the idea that "the culpability of the indebted partner is irrelevant," even when "the partner is innocent of wrongdoing, and had no knowledge or reason to know of the fraud . . . ." Quinlivan, 434 F.3d at 319. Applied to the present case, if Americorp employees, acting as agents for Nelms, committed fraud in incurring the debt to Chase, then Nelms's debt to Chase is not dischargeable under § 523(a)(2)(A). Under this test, the mere presence of an agency relationship combined with fraud by the agent is all that the court examines.

Other courts have required more than the simple presence of an agency relationship to impute an agent's fraud onto the principal. These courts, in the minority, have turned to a "'reckless standard, requiring that the debtor knew or should have known of the agent's fraud in

16

order to impute intent.'" Heinz, 501 B.R. at 762 (citing Treadwell v. Glenstone Lodge (In re Treadwell), 637 F.3d 855 (8th Cir. 2011). While not requiring active participation by the debtor-principal in the fraud, the debtor-principal "cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud." Matter of Walker, 726 F.2d 452, 454 (8th Cir. 1984) (citing In re Savarese, 209 F. 830 (2d Cir. 1913) and David v. Annapolis Banking & Trust Co., 209 F.2d 343, 344 (4th Cir. 1953)).

Courts within our Circuit have contemplated whether the Circuit would apply the majority or the reckless standard approach. See Heinz 501 B.R. 762-765 (choosing the majority view); and Gordon, 293 B.R. at 823 (applying the higher burden of the reckless indifference standard). This stems from the perceived less than full embrace given to the majority approach in Villa. However, for purposes of this case, this Court need not mine Villa for the Circuit's intent on this issue because under either standard Nelms's culpability for fraud can be imputed from the blatant fraud committed by his agents. Nelms is not the truly innocent debtor envisioned in the majority test, and evidence at trial established that he had the knowledge of his agents' fraud necessary to meet the reckless standard test.

The facts proven at trial show that Nelms was certainly aware of the fraud being perpetrated by Americorp in their dealings with Allegro customers. He testified to working very hard to hire the former marketers of the Hess-Kennedy fraud once that operation was ended. Nelms was clearly aware of the fraud being perpetrated by Hess-Kennedy; he, in fact, participated in the fraud himself as an agent of Hess-Kennedy. Further, there is no real dispute as to whether Americorp and its employees operated as agents for Nelms. Americorp and its marketers were hired by Nelms to induce customers into signing up for Allegro, and to act on

17

Nelms's behalf. He hired Americorp with full knowledge of how they had executed fraud for Hess-Kennedy, and it was clear from his testimony at trial that the experience in debt settlement fraud that Americorp possessed was valued by Nelms in his pursuit of them and in his rote use of their letters that he sent verbatim to Chase. Nelms testified that he had been interested in working with Americorp to accomplish his own business purposes when he saw how effective they had been at executing the Hess-Kennedy scheme. Once Hess-Kennedy collapsed, he quickly hired Americorp to effectuate the same fraud for his operation. Nelms testified at trial to being aware of the misrepresentations Americorp marketers were making on behalf of Allegro Law. Under the majority test, which imputes the fraud of an agent regardless of the debtor-principal's knowledge, the fraud committed by Americorp employees is imputed to Nelms. Under the minority reckless standard test, because he did actually know of the fraud being committed, the fraud committed by Americorp employees is imputed to Nelms. Through the vehicle of Allegro Law, and the services of Americorp, Nelms committed a massive fraud on thousands of Chase cardholders.

### C. Through Allegro, Nelms Committed Fraud and Proximately Caused Harm to Chase, Rendering the Debt Nondischargeable Pursuant to § 523(a)(2)(A)

Debts incurred as a result of fraud are excepted from discharge under § 523(a)(2)(A), which provides, in part:

> (a) A discharge under section 727 ... does not discharge an individual debtor from any debt—
> (2) for money, property, services ... to the extent obtained, by—
> (A) false pretenses, a false representation or actual fraud, other than a statement respecting a debtor's or an insider's financial condition.

18

11 U.S.C. § 523(a)(2)(A). "Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud." <u>Sec. and Exch. Comm'n v. Bilzerian (In re Bilzerian)</u>, 153 F.3d 1278, 1282 (11th Cir.1998).  Accordingly, there are four elements of a fraud claim that the plaintiff must prove by a preponderance of the evidence:

> (1) The debtor made a false representation of a past or current material fact;
> (2) With the intent to deceive the creditor;
> (3) The creditor justifiably relied upon the representation; [and]
> (4) The creditor sustained loss as a proximate result of the representation.

<u>Id.</u> at 1281. Section 523(a)(2)(A) captures the Code's competing purpose with giving the debtor a fresh start. That is, while we generally assume the bankruptcy code's protections to be aimed at providing a fresh start for the debtor, § 523(a)(2)(A)'s purpose is to protect the victim of fraud. <u>see</u> <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 223, 1128 S.Ct. 1212 (1998); <u>see also</u> <u>Grogan</u>, 498 U.S. at 286-287 (explaining the limits on Congress's policy of a fresh start for a debtor under the Code, confining "the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor.") (citations omitted).

### 1. Nelms and Allegro Made False Representations of Material Facts With the Intent to Deceive, Upon Which Chase Cardholders Relied

The misrepresentations of material facts made by Nelms and Allegro to Chase cardholders are vast and have been well documented in Section I(B)(3), *supra*, of this Memorandum. For purposes of thoroughness, however, it is worth noting that virtually each piece of the Allegro operation functioned on the customer being misinformed and kept in the dark as to what they were paying for and how their debts were being handled. The most basic promise of Allegro made to customers, that Nelms and Allegro could and would settle the

19

customers' debt, was a blatant misrepresentation. Each Allegro customer from which the Court heard testimony was promised that all of their debts would be settled; this was their primary motivation for entering and paying into the Allegro scheme. Allegro did not fulfill this promise, and the evidence at trial showed that Nelms and Allegro had no intention of settling debts and did not in fact settle customer debts. Nelms and Allegro misrepresented their ability to settle debts with Chase, despite awareness that Chase had a policy of not settling with Allegro. Nelms and Allegro misrepresented their status as a law firm and ability to provide legal services to customers. Further, Nelms and Allegro misrepresented the fee structure of the program, and never informed customers that of their monthly payments, large portions, if not all, would instead go to massive fees to Nelms, Allegro, and Americorp.

Allegro promised to pay off Chase cardholder debts through settlements with the intent to deceive Chase cardholders. Had Chase cardholders known these debts could not be negotiated through Allegro, they would not have paid into the scheme. Indeed, each Allegro-affected Chase customer that provided testimony at trial said they would never have paid into Allegro if they had known their Chase debts could not be settled. Nelms's fee structure made it functionally impossible to settle debts, and he misrepresented the fees in order to deceive customers to continue paying into the scheme so he could collect massive fees without paying off any of their debts. Each of the Allegro customers that testified at trial told that they would never have signed onto the Allegro scheme had they been told the truth about the fee structure. In short, Nelms's deception through Allegro and Americorp purposely induced Chase cardholders into a fraudulent scheme designed to make himself rich.

20

## 2. Nelms's Fraud Proximately Caused Financial Harm to Chase, and Chase has Proven Damages of $9,797,229.52

The damages incurred by Chase as a result of Nelms's fraud were well documented at trial. Susan Coniglio, Chase's business operations director overseeing collections, performed a damages estimate that sought to capture the more nuanced damage Chase incurred from the Allegro scheme, rather than simply the base dollar amount of debt not paid by Allegro-affected cardholders. The total debt owed to Chase by the 5,453 Allegro-affected cardholders is in the neighborhood of $38 million. Chase readily admits, however, that it would be unreasonable to assume every cardholder would have paid every dollar they owed to Chase had they not become involved with Allegro. The more accurate approach, and the one presented by Coniglio, is one that seeks to put a dollar amount on the total that Chase reasonably could have expected to have been paid absent the Allegro fraud.

The first step in Coniglio's process is adjusting the accounts downward to get a more realistic view of which customers may have paid. This means taking off any customer who was in the later stages of delinquency and was not likely to pay (1,197 customers), any customer with whom Chase settled as of December 2012 (649 customers)[5], customers who abandoned Allegro and paid on their own (278 customers), and two fraud accounts. This leaves 3,327 customers for a charge-off balance of $25.9 million. Again, though, this number was adjusted downward by Coniglio to be more accurate. Specifically, she wanted to use the balance from the time when Chase received the Allegro letter rather than the balance at the point of charge-off, at which point

---

[5]While Cirmonara testified that there were only 58 Chase accounts settled while Allegro was active, Chase began to negotiate with the cardholders once Nelms was out of the picture.

the account would have accrued fees and interest. This removes about $3.4 million in fees for a balance of $22,534,096.

Coniglio's next step was to determine the actual likely payment stream from those 3,327 customers by looking for population of Chase customers who were similar to the Chase customers in the Allegero scheme-essentially a blend of customers looking to self-cure and those already in collection.[6] This group made sense as an analogue to Allegro-affected customers because Allegro customers were account holders who were delinquent but yet able to pay over some funds; in other words, but for Allegro, many Allegro customers likely had the funds to make some minimum monthly payment to Chase. Coniglio then did a payment stream analysis of this group out over a 210-day period to determine what percentage of their balance did this similarly situated group pay over a seven-month period.[7] The average payment rate from this grouping was 43 percent. Taking 43 percent of the balance at the time Chase received Allegro letters, $22,534,096.00, produces a balance of $9,979,229.52.[8]

The evidence and testimony at trial showed that Nelms and Allegro proximately caused this damage to Chase. It was largely undisputed at trial that the basic operation of Allegro was

---

[6]Coniglio defined self-cure as "customers that enter delinquency and . . . eventually cure out of delinquency" without having to be pursued by Chase collection attempts. The in collection group was defined as "delinquent, but they were not able to self-cure themselves." Tr. Transcript 196:16-198:15.

[7]Coniglio analyzed this set of Chase cardholders in a period dating back to January 2011 and a period dating back to April 2011. 2011 data compared favorably to 2008 and 2009 data. For example, from February 2008 to June 2009, Chase had a settlement rate of 52.2 percent; for the year of 2011, the settlement rate was 49 percent.

[8]This damages estimate has been adopted by the Eastern District of New York in Chase's suit there against Allegro. See Chase Bank USA, N.A. v. Allegro Law, LLC, et al., 08-cv-4039(PKC) (E.D. N.Y.).

premised on the fact that the creditor would pay money into Allegro rather than to their creditors. In fact, it was shown that Allegro discouraged their customers from paying creditors like Chase as a matter of basic policy. In that sense, Allegro collected money from Chase cardholders that otherwise could have been paid over to Chase directly. Nelms and Allegro misled their customers into thinking this money would be paid to Chase, while failing to inform the customers that Chase's internal policy would not allow settlements with Allegro. Therefore, money otherwise due to Chase was diverted by Nelms and Allegro into a fraudulent scheme, and was instead used by Nelms and Allegro for millions of dollars of profit.

### D. Chase's Allegation of Defalcation Pursuant to § 523(a)(4) Fails for Lack of a Fiduciary Relationship with Nelms

Section 523(a)(4) provides that a debtor cannot discharge a debt incurred through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C § 524(a)(4). A debt is nondischargeable based on defalcation if the creditor proves three elements: (1) the debtor stood in a fiduciary relationship with the creditor; (2) the fiduciary relationship existed prior to the creation of the debt; and (3) the debt resulted from an act of defalcation. Quaif v. Johnson, 4 F.3d 950, 953–55 (11th Cir. 1993). The creditor seeking to except the debt on grounds of § 523(a)(4) bears the burden of proving "the existence of an express or technical trust and not merely the existence and breach of a fiduciary duty." In re Lucas, 477 B.R. 236, 242 (Bankr. M.D. Ala. 2012). Once a fiduciary relationship in the context of a trust is established, the creditor must show a defalcation by the debtor. The Supreme Court has recently examined § 523(a)(4) to discern the meaning of defalcation, finding it to require an intentional wrong, or when "actual knowledge of wrongdoing is lacking, . . . . if the fiduciary consciously disregards

23

(or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." Bullock v. BankChampaign, N.A., __U.S. __, 133 S.Ct. 1754, 1759 (2013).

Chase seeks to establish a fiduciary relationship with Nelms with which to base nondischargeability upon the fact that Allegro had its customers authorize limited powers of attorney. There are two problems with Chase's approach. First, the power of attorney does not create the fiduciary duty necessary to give rise to an action under § 523(a)(4). "'As a rule, the general fiduciary duty created by a power of attorney gives rise to an agency relationship, but does not give rise to the fiduciary capacity required by section 523(a)(4).'" In re Scott, 481 B.R. 119, 190 (Bankr. N.D. Ala. 2012) (quoting Pioneer Bank & Trust v. Cameron (In re Cameron), 2008 WL 5169513 (Bankr. D. S.D. Oct. 17, 2008)). Further, even if it could be shown that some elevated level of fiduciary duty existed giving rise to a nondischargeability action, that fiduciary duty would extend only to Nelms and Allegro and the Chase cardholders. It would not establish a fiduciary duty between Nelms and Chase. Without being in a fiduciary relationship with Chase, Nelms could not commit a defalcation against them. Accordingly, Chase has failed to prove this count of the complaint, and the nondischargeability of Nelms's debt to Chase cannot rest on § 523(a)(4).[9]

### E.  Nelms's Motion to Dismiss Based on Statute of Limitations is Without Merit

On the eve of the trial, Nelms filed a motion to dismiss alleging that Chase's complaint

---

[9]Additionally, Chase has asserted a nondischargeability claim based upon 11 U.S.C. § 523(a)(6), alleging willful and malicious injury by the debtor to Chase. Because a § 523(a)(6) analysis would seem largely redundant in light of the fraud analysis discussed in II(C), the Court declines to reach the § 523(a)(6) claim, and instead rests the nondischargeability of Nelms's debt to Chase on grounds of § 523(a)(2)(A).

should be dismissed based on the grounds that Chase's complaint was barred by the statute of limitations under 11 U.S.C. § 727(e). (Doc. 128). Nelms's motion is without merit for two reasons. First, Chase timely filed its complaint. Second, Nelms waived his statute of limitations argument because he failed to raise it as an affirmative defense in his answer.

Nelms filed his Chapter 7 petition on February 22, 2010, and notice of commencement of the case was given to parties in interest, as well as notice of meeting of creditors, which was scheduled for March 31, 2010. (10-30430, Doc. 5). The deadline to file actions pursuant to 11 U.S.C. § 523(c), was June 1, 2010. Id., see also, Rule 4007(c), Fed. R. Bankr. P. Chase timely filed its complaint on June 1, 2010. (Doc. 1).

Nelms filed his answer on June 29, 2010. (Doc. 10). While he denied a number of the allegations of the complaint and raises several defenses, he did not raise the statute of limitations, or the bar of Rule 4007(c), in his answer. Rule 8(c), Fed. R. Civ. P., states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . statute of limitations." (Made applicable to these proceedings pursuant to Rule 7008, Fed. R. Bankr. P.). As Nelms failed to plead the statute of limitations in his answer, he has waived it. Id.; Day v. Liberty National Life Ins. Co., 122 F.3d 1012, 1015 (11th Cir. 1997).

Nelms was granted a discharge by this Court on January 23, 2012. (10-30430, Doc. 107). It is important to note that all Chase seeks here is a declaration from this Court, that Nelms's debt to it Chase excepted from that discharge under § 523(a)(2). That is, Chase is not opposing the grant of a discharge to Nelms pursuant to 11 U.S.C. § 727. If Nelms did not receive a discharge pursuant to 11 U.S.C. § 727, it would not be necessary to determine whether Chase's debt was

excepted from it. The entry of a discharge in favor of a debtor is a necessary precondition for the efficacy of an exception, rather than–as Nelms alleges–a bar.

Nelms also argues that Chase should have prosecuted its dischargeability action in the context of a civil action in the Eastern District of New York in 2002. See Chase Bank, USA v. Allegro Law, LLC, et. al., Case No. 08-CV-4039.  This Court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1334(b).  Nelms cites no authority for the proposition that the action should have been prosecuted in the Eastern District of New York rather than here, and this Court is aware of none.  Moreover, it appears that the only court in which venue would have been proper is this Court.  28 U.S.C. § 1409(a).

### F.  Nelms's Motion to Recuse is Without Merit

Four days prior to the start of trial, Nelms filed a Motion to Recuse.  (Doc. 124).  Nelms contends that the Bankruptcy Judge was biased against him because he wrote a letter to the Alabama State Bar opposing the reinstatement of Nelms's law license.  Before addressing the merits of Nelms's claim, a brief review of the context in which this letter was written would be informative.

On June 25, 2009, the Alabama State Bar suspended Nelms's law license, for a period of three years, for his unethical conduct in connection with the Allegro debt settlement scheme.  (Pl. Ex. 13).  After serving his suspension, Nelms petitioned the State Bar to reinstate his law license. Dianne Gray, an Investigator for the State Bar sent a copy of Nelms's petition to the Bankruptcy Judge with a request for comments.[10]  The October 17, 2013 letter, a copy of which is attached to

---

[10]  Nelms law license was originally suspended for three years.  During the period of suspension, the Alabama Bar extended the period of suspension by an additional 90 days as a result of several

Nelms's motion, is the Bankruptcy Judge's response. The October 17 letter is five pages long

and addresses three material false statements made by Nelms in detail. The salient point is that

Nelms filed a petition for reinstatement with the Bar which contained false statements relating to

his bankruptcy filing or to this Adversary Proceeding. The Court will attach copies of four items:

(1) Nelms's Petition for Reinstatement; (2) the Bankruptcy Judge's Letter of October 17, 2013;

(3) the Alabama State Bar's Conditional Order on Guilty Plead, dated June 25, 2009 (suspending

Nelms' law license for three years); and (4) the Judgement of the Circuit Court of Autauga

County, Alabama, dated February 11, 2010, in <u>Alabama v. Allegro Law, LLC</u>, CV-09-125

(finding that Nelms has perpetrated a fraud on the Allegro customers, among other things).

Nelms alleges that the October 17 letter shows that there is an appearance of impropriety

or bias and, for that reason, the undersigned should recuse, citing <u>Ex Parte Rollins</u>, 495 So.2d

636 (1986). In <u>Rollins</u>, the Alabama Supreme Court granted a writ of mandamus, requiring a

trial judge to recuse from a case where the judge had "intense negative feelings" against one of

the lawyers. It should first be noted that the "intense negative feelings" arose from prior dealings

between the lawyer in question and the trial judge, issues that had forced the trial judge to recuse

himself in two prior matters. The judge made a complaint against the lawyer with the bar,

however, the bar did not sanction the lawyer.

Nelms misreads the decision in <u>Rollins</u>. It is not a blanket rule that a trial judge must

always recuse if he has made a bar complaint against any lawyer, or party, in a case. The judge's

---

instances of unethical conduct committed by Nelms. Because Nelms' suspension was for a
period of time greater than 90 days, his law license was not automatically reinstated at the
conclusion of the period of suspension. Rather, he was required to petition for reinstatement.
<u>See</u>, Rules 8, 28, Alabama Rules of Disciplinary Procedure.

bar complaint in <u>Rollins</u> was a symptom of the "intense negative feelings," bourne out of extrajudicial animus, and not the bar complaint itself that triggered the need to recuse.  The October 17 letter written by the undersigned Bankruptcy Judge was not a formal bar complaint, but instead was in response to a request for information from the bar, based on evidence heard by the Bankruptcy Judge over a period of four years and not the product of any extrajudicial bias of intense negative feelings.  To hold that a judge in such a situation must chose between speaking out as to what he knows–based on numerous motions, evidentiary hearings as well as a judgment from the Circuit Court of Autauga County, Alabama-and recuse from a large, complicated case in which he has invested four years, or keep silent and allow a party to make false statements and mislead another tribunal is a dilemma the law does not place on a trial judge.

Recusal is governed by 28 U.S.C. § 455(a) which states that "any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonable be questioned."  <u>Ginsberg. v. Evergreen Security, Ltd., (In re Evergreen Security, Ltd.)</u>, 570 F.3d 1257, 1263 (11th Cir. 2009).  "Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." <u>Liteky v. United States</u>, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157 (1994); <u>see also</u>, <u>Mantiply v. Horne</u>, 2014 WL 1370515 (S.D. Ala. April 8, 2014).  The facts which came to the attention of the undersigned Bankruptcy Judge, which underlie the October 17 letter to the State Bar, all

28

came to his attention through the course of the Allegro and Nelms bankruptcy cases and related Adversary Proceedings. Nelms does not allege any extrajudicial source for the matters he complains of. Nelms's claim of bias is without merit.

## CONCLUSION

Chase has provided a thorough account of the massive fraud committed by Nelms through Allegro Law on thousands of Chase account holders. Through misleading advertisements and fraudulent promises to solve debt problems for consumers, Nelms orchestrated a scheme that induced thousands to halt payments to their creditors and instead divert the money to him. Millions of dollars otherwise due to Chase were instead collected by Nelms and his agents in the form of costly fees, causing alarming financial harm to consumers in the process. The Court heard ample testimony of the reliance consumers placed on Nelms's misrepresentations, and of the damage caused to Chase as a result. Accordingly, judgment is due to be entered in favor of Plaintiff Chase Bank, and the debt of $9,979,229.52 owed by Nelms is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). A separate order to this effect will be entered.

Done this 24th day of July, 2014.


/s/ William R. Sawyer
United States Bankruptcy Judge




c: Clark R. Hammond, Attorney for Plaintiffs
   John D. Norris, Attorney for Defendant